**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN THE MATTER OF THE EXTRADITION | ) | |
| | ) | |
| OF | ) | M.J. No. 05-MJ-00876 |
| | ) | |
| GIOVANNI GAMBINO | ) | |
| | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO BAIL**

**I.   INTRODUCTION**

The Defendant, Giovanni Gambino ("Gambino"), was arrested on
October 14, 2005, pursuant to a provisional arrest warrant issued
by this Court, as requested by the Republic of Italy.  A warrant
for his arrest was issued on August 29, 1990, by the Court of
Palermo charging Gambino with purchasing, keeping, transporting,
refining, and exporting of narcotic drugs (heroin) committed in
complicity with other persons, in violation of Articles 81 and
110 of the Italian Criminal Code, and Article 71 of Law No. 685
of December 22, 1975; aggravated by the fact that Gambino
belonged to a criminal association and that a large amount of
narcotic drugs was involved, in violation of Article 74,
paragraphs 1 and 2 of Law No. 685 of December 22, 1975.

The Defendant's extradition is sought by Italy pursuant to
its extradition treaty with the United States, Treaty on
Extradition, U.S. - Italy, October 13, 1983, 35 U.S.T. 3023 ("the
Treaty").  Article 2 of the Treaty provides for the extradition
of persons accused of the crimes with which the Defendant is

charged.

The United States, acting at the request (and as the agent) of the Italian Government, urges that Gambino be held without bond pending a hearing on extraditability.

**II.  APPLICABLE LAW**

The federal statute that implements the United States' extradition treaties with other nations, 18 U.S.C. §§ 3184 et seq., does not provide for bail.  Because an international extradition is not a criminal case, the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., does not apply and the criteria governing the allowance and the amount of bail in United States criminal cases, 18 U.S.C. § 3142 (g), are not applicable.  Kamrin v. United States, 725 F.2d 1225, 1227-1228 (9th Cir.), cert. denied, 469 U.S. 817 (1984).  The Bail Reform Act applies only to offenses against the United States that are triable in United States courts.  Requests for extradition involve offenses against the laws of foreign countries.  Therefore, the Bail Reform Act is inapplicable.[1]  Given the absence of statutory law governing bail in international extradition proceedings, the issue must be determined based on federal case law.

---

[1]    The term "offense" for the purposes of Section 3141 is defined in 18 U.S.C. § 3156(a)(2) as "any criminal offense, other than an offense triable by court martial, military commission. provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress . . . ."

**A.   The Presumption Against Bail in an
       International Extradition Proceeding.**

The United States Supreme Court and the federal courts of
appeals have long held that bail should not ordinarily be granted
in international extradition proceedings, rather bail should be
granted only under the most unusual circumstances.  <u>Wright v.
Henkel</u>, 190 U.S. 40 (1903) (affirming detention without bail of a
fugitive sought by Great Britain for defrauding a corporation of
which he was a director).

Where a foreign government makes a proper request under a
valid extradition treaty, the United States is obligated to
deliver the person sought after he or she is apprehended.  As the
Supreme Court explained in <u>Wright</u>:

> The demanding government, when it has done all that the
> treaty and the law require it to do, is entitled to the
> delivery of the accused on the issue of the proper
> warrant, and the other government is under obligation
> to make the surrender; an obligation which it might be
> impossible to fulfill if release on bail were
> permitted.  The enforcement of the bond, if forfeited,
> would hardly meet the international demand; and the
> regaining of the custody of the accused obviously would
> be surrounded with serious embarrassment.

<u>Id</u>. at 62.

The United States Court of Appeals for the First Circuit
recognizes that there is a presumption that bail should not be
granted in an extradition case.  <u>Beaulieu v. Hartigan</u>, 554 F.2d 1
(1st Cir. 1977) ("Unlike the situation for domestic crimes, there
is no presumption favoring bail.  The reverse is rather the

3

case.")  The reasons for this presumption against bail in international extradition cases are compelling.  A person sought for an extraditable offense is already an international fugitive from justice whom it is reasonable to expect will flee if alerted to the charges.  Moreover, the fact that he faces an international extradition to a foreign state for a serious charge where his fate is uncertain is itself a strong incentive to flee.

In addition to its legal obligation, the United States has a compelling self-interest to fulfill its duties under extradition treaties.  It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations will meet their reciprocal obligations to the United States.

**B.    Federal Courts Allow Bail in Extradition Matters Only When "Special Circumstances" Are Shown.**

In order to avoid the potential harshness of an absolute prohibition on bail, but also to allow our government to meet its treaty obligations, the federal courts have held that bail may be granted in pending extradition proceedings only in "special circumstances."  United States v. Lui Kin-Hong, 83 F.3d 523, 524 (1st Cir. 1996) (applying "special circumstances" test, finding that the potential of unusually complex and protracted extradition hearing did not qualify); United States v. Williams, 611 F.2d 914, 915 (1st Cir. 1979) (defendant's being considered

4

tolerable risk of flight not a special circumstance).

The Defendant has been incarcerated for the last 15 years on a case out of the Southern District of New York.  The Court has asked the government to determine what arguments were made in favor of detention in the New York case, and specifically, what arguments were made in regard to dangerousness.

**III. BACKGROUND**[2]

Gambino was arrested on January 4, 1990 for an indictment alleging several counts, including violations of the federal narcotic laws and the Racketeering Influenced and Corrupt Organization Act ("RICO").  <u>United States v. Gambino, et al.</u>, 809 F.Supp. 1048, 1050 (S.D.N.Y. 1992).  Although the Government argued that Gambino was a "major organized crime figure and drug dealer who posed a significant danger to the community," the Government, in the face of its unsuccessful attempts to hold Gambino's brother based on a similar argument, ultimately agreed

---

[2]   As the official court records for the United States District Court, Southern District of New York, and records from the United States Attorney's Office for the Southern District of New York are archived, the Government has been unable to retrieve them in time for today's hearing.  However, from conversations with the trial attorney for the United States, Patrick Fitzgerald, and review of the decisions from the trial court and the Second Circuit, a factual background is available relevant to the issue of bail.  Consequently, for the purposes of this memorandum, the Government takes the unusual step of citing to the published and, in some cases, the unpublished decisions for the facts and proceedings of the underlying case.

to the release of Gambino on strict conditions.[3]  Id. at 1051.

Those condition included a $2,000,0000 personal recognizance bond

co-signed by Vittoria Gambino and Tommy Gambino, Gambino's wife

and son.  Id. at 1051.  Additionally, Gambino was ordered to wear

an electronic bracelet, but was allowed to work, visit with his

attorneys, and attend religious services and medical

appointments.  Id. at 1052.

   Two and one half years later, the Government, in response to

---

   [3] The Defendant's brother, Joseph Gambino, had also been
arrested on a preceding, but related, indictment on December 1,
1988.  Id. at 1050.  At the detention hearing for Joseph Gambino,
the court found that:

          Joseph Gambino, through his high-ranking
          stature in a multi-faceted narcotics and
          racketeering criminal organization, had the
          ability to command the criminal acts of
          others and, thus, posed a danger to the
          community.  Id. at 1050.

   Subsequently, over the Government's objection, Joseph
Gambino was released to reside at a community treatment center,
while on an electronic bracelet and a fully-secured $1,000,000
bond, in order to prepare for trial and consult with his
attorneys.  Id. at 1050.  The Government's appeal of the order
was unsuccessful, although the District Court Judge added some
modifications.  Id. at 1051.  After repeated complaints from
Joseph Gambino's attorneys that their ability to prepare for
trial was restricted at the community center, the Government
consented to house arrest for the bailee.  Id. at 1051.  Not long
passed before Joseph Gambino sought further easing of the
restrictions.  Id. at 1051.  Again, the Government relented in
the face of the Court's concern over the lengthy pre-trial delay.
Joseph Gambino was allowed to then work.  Id. at 1051.  In
September 1989, based on a new charge of witness tampering
alleged in a superseding indictment, the Government moved to
revoke his bail.  Id. at 1051.  The request was denied, but a
restricted list of visitors and activities was issued for the
bailee.  Id. at 1051.

complaints by the Pre-Trial Services Agency, asked the Court to cease the bracelet monitoring.  Id. at 1052.  At issue was Gambino's frequent black-out periods rendering the bracelet largely ineffective.  Id. at 1052.  The bracelet was removed. Id. at 1052.

**A.   Gambino Flees**

On August 24, 1992, the Grand Jury returned an eighth superseding indictment.  Id. at 1052.  New to the indictment were charges alleging murder against Gambino.  The indictment also named Gambino in the "continuing criminal enterprise" for the first time.  Id. at 1052.  The Government informed counsel for Gambino and his brother, Joseph Gambino, that it intended to move to revoke their bail upon arraignment on September 1, 1992.  Id. at 1052.

Both Gambino brothers failed to appear at their scheduled arraignment.  Id. at 1052.  The Government contacted Gambino's heart doctor in Houston, with whom Gambino was scheduled to meet the day before, and learned that Gambino had not appeared for the appointment.  Id. at 1052.  Arrest warrants were issued for the brothers.

On September 20, 1992, FBI agents arrested Gambino at a hotel in Fort Lauderdale, Florida, after an intensive international manhunt.  United States v. John Gambino, et al., 1993 WL 300048 (S.D.N.Y. 1993).  In the opinion regarding

Vittoria Gambino and Tommy Gambino's request for partial remission of the $2,000,000 judgment of forfeiture entered against them, the Court noted the enormous resources the Government expended in arresting the fugitives:

> . . . the international manhunt resulting from John Gambino's flight involved the substantial efforts of several federal agencies around the world.  The Government notes that the Federal Bureau of Investigation (FBI) devoted the attention of approximately six agents to the investigation who were assisted by the efforts of many other agents, and leads were sent to all 65 FBI field divisions and the FBI's 22 legal attaches around the world. . . the fugitive hunt involved extensive FBI efforts in at least four foreign countries and also involved the efforts of three foreign police services.

Id. at 3.  The denial of requested remission was affirmed by the Second Circuit.  United States v. John Gambino, 17 F.3d 571 (2nd Cir. 1994).

   B.   **Ninth Superseding Indictment**

   On September 28, 1992, after Gambino's apprehension, the Grand Jury filed the ninth superseding indictments against the defendants in the case.  United States v. Gambino, et al., 809 F.Supp. 1061, 1062 (S.D.N.Y. 1992).  Count One charged the defendants with conspiring to participate in a criminal enterprise, in violation of RICO, 18 U.S.C. § 1962(d); Count Two charged the defendants with participating in a criminal enterprise, in violation of RICO, 18 U.S.C. § 1962(c); Count Three charged the defendants with conspiring to violate the

federal narcotics laws, in violation of 21 U.S.C. § 848(a) and

(b); Count Four charged John Gambino and Joseph Gambino with

engaging in a continuing criminal enterprise, in violation of 21

U.S.C. § 848(a) and (b); Count Five charged John Gambino and

Joseph Gambino, on March 15, 1998, with distributing and

possessing heroin with the intent to distribute, in violation of

21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2;

Counts Six and Seven charged John Gambino, Joseph Gambino and

Lorenzo Mannino with conspiring to murder (Count Six) and

murdering (Count Seven), Francesco Oliveri in aid of

racketeering, in violation of 18 U.S.C. § 1959; Count Eight

charged John Gambino and Joseph Gambino with failing to appear

before the Court, in violation of 18 U.S.C. § 3146(a)(1) and

(b)(1)(A)(i); and Counts Nine and Ten charged forfeiture

allegations.  Id. at 1063.

District Court Judge Leisure described the indictment as

follows:

> The indictment alleges that the defendants
> participated in the illegal activities of an
> international criminal organization known as "the
> Mafia" or "La Cosa Nostra," which allegedly
> includes groups in both the United States and
> Sicily.  More specifically, the enterprise charged
> in the indictment allegedly consists of "made"
> members and associates of the Gambino Family of
> the American Mafia, together with "made" members
> and associates of the Passo Di Rigano, San
> Lorenzo, and Santa Maria di Gesu Families of the
> Sicilian Mafia.  According to the Government, this
> organization, or system of organizations, has
> engaged in the importation and distribution of

9

large quantities of narcotics in violation of
federal law, as well as other illicit activities
such as illegal gambling and loansharking.  It is
alleged that the affairs of this enterprise have
been conducted through various acts of violence
including extortion and murder.

Id. at 1062.

C.    **Anonymous Jury and Willingness to Corrupt the Judicial
      System**

The Government moved to impanel an anonymous jury.  Id. at
1062.  In finding that the Government presented substantial
evidence that there was a "likelihood of interference with the
judicial process on the part of either the defendants or their
alleged associates within the Gambino Crime Family" the trial
court noted that in support of the Government's contention of
potential violence and obstruction, Gambino had been charged with
murder and there was evidence that the Gambino Crime Family had a
history of attempting to interfere with the judicial process.
Id. at 1066.  The Court noted that additional support for
granting an anonymous jury was found in the testimony of
Salvatore Gravano in United States v. Gotti where Gravano
testified "that John Gambino participated in an effort to tamper
with a jury in the early 1990 trial of Gambino Family 'capo,'
Edward Lino."  Id. at 1067.  The Court also emphasized that
Gambino was alleged to be have been a captain in the Gambino
Crime Family and other named defendants were alleged to be part
of Gambino's crew.  Id. at 1066.

10

D.    **Guilty Plea**

The first trial in the above indictment ended in the jury convicting John and Joseph Gambino of bail jumping only. <u>Mannino v. United States</u>, 1998 WL 67674 (S.D.N.Y.1998). The jury hung, eleven to one for conviction, on the remaining counts and the Court granted a mistrial. <u>Id.</u> at 1. Following the selection of a new trial jury, John Gambino pled guilty to Count One of the indictment.[4] <u>Id.</u> at 1. In his plea allocution, Gambino admitted that he had conspired to participate in a criminal racketeering enterprise that engaged in narcotics trafficking, the murder of Francesco Oliveri, loansharking, and illegal gambling, in violation of 18 U.S.C. § 1962(d). <u>Id.</u> at 1. Gambino was sentenced to 15 years in prison. <u>Id.</u> at 1.

E.    **Gambino's Medical Motions**

In anticipation of the first trial, Gambino moved for a medical severance, arguing that his medical disabilities, including a heart ailment, depression and mental difficulties, required a severance from his co-defendants. <u>Id.</u> at 1077. The Government argued that Gambino's activities subsequent to his

---

[4] In consideration for Gambino's plea of guilty, the Government submitted a <u>nolle prosequendum</u> as to the bail jumping count with which Gambino had been convicted at trial. However, Gambino agreed not to contest his guilt on the count for purposes of forfeiture proceedings against him. Additionally, as a condition precedent to the Government's submission of the <u>nolle prosequendum</u>, Vittoria Gambino and Tommy Gambino each stipulated that they would not challenge the bail forfeiture judgment previously rendered.

1985 stroke and 1987 heart surgery belied Gambino's contention that he was unable to stand trial. Id. at 1077. Despite Gambino's heart ailments, he was able to continue his substantial involvement in the illegal activities of the Gambino Crime Family. Id. at 1078. Although the Court did not consider this factor in denying Gambino's motion, the Court did give weight to Gambino's flight to Florida as an indication of his good health. Id. at 1078.

In July 1993, before his scheduled November 1993 re-trial, Gambino moved the Court to declare him incompetent to stand trial due to his mental and physical health. United States v. Gambino, et al., 828 F.Supp. 191, 191 (S.D.N.Y. 1993). The motion was denied, but in regard to his physical health, the court reviewed old and new conflicting medical reports presented by the defendant's physicians and those hired by the Government to examine Gambino. Id. at 203. The Court found that Gambino's heart ailment, and other medical conditions relating to his stroke in 1985, did not preclude him from taking the stand in his own defense and that reports filed by Gambino's physicians regarding his heart condition carried little weight. Id. at 202-203.

## IV.  Special Circumstances

Whether the defendant's medical condition is sufficiently a "special circumstance" allowing for his bail is not an issue that

12

has been raised often in the case law.  Although an example of such a circumstance would be where a serious deterioration of health occurs while incarcerated, the Government contends that the defendant has not shown that to be the case here.  <u>Salerno v. United States</u>, 878 F.2d 317, 317 (9th Cir. 1989); <u>See United States v. Glantz</u>, 1994 WL 168019 (S.D.N.Y.1994)(no special circumstance where prison facility able to accommodate medical condition); <u>cf.</u> <u>Hu Yau-Leung v. Socia</u>, 649 F.2d 914 (2nd Cir.), <u>cert</u>. <u>denied</u>, 454 U.S. 971 (1981) (special circumstance where no available facility to house 16 year old).

The defendant argues that his medical condition is such that no jail facility can accommodate his condition.[5]  However, FMC Devens managed his medical condition well and his incarceration at the Plymouth House of Corrections this past weekend presented no problems.

_____

[5]   The defendant further argues that the charges that were tried in New York in 1993 are the same charges for which Italy has now sought the defendant's provisional arrest and therefore, the Treaty bars a second prosecution.  The Government is not clear whether in fact this is the case.  Although the Italian charges outline the same general time frame, it is premature to suggest that the Italian prosecution would be barred.  It is the purpose of the extradition hearing to determine whether the crimes for which surrender was requested were covered by the Treaty.  As the parties to the Treaty have agreed that the principles of dual sovereignty do not apply, then the Court would have to apply the <u>Blockburger</u> test, or a <u>Blockburger</u> - like test, to establish whether the charges are the same.  <u>Sindona v. Grant</u>, 619 F.2d 167, 178 (2nd Cir. 1980); <u>Elcock v. United States</u>, 80 F.Supp.2d 70, 83 (E.D.N.Y. 2000); <u>In the Matter of the Extradition of Montiel Garcia</u>, 802 F.Supp.773, 779 (E.D.N.Y. 1992).

Additionally, unlike the underlying New York case where pre-trial delay was part of the reason that the government agreed to Gambino's initial release, here, Italy is allowed only 45 days in order to present its extradition package to the United States. Therefore, the period of time that Plymouth will be required to care for the defendant and manage his medical condition is relatively short.

Moreover, given Gambino's admission to facts alleging bail jumping, and his wife and son's forfeiture of $2,000,0000 as a result, the Court should not place Gambino in that same position of trust again.  When the defendant fled in 1992, he understood that his wife and son would lose $2,000,000.  Gambino's actions suggest that his desire to be free was greater than his concern at his family's loss of a significant amount of money.  In addition, Gambino's illegal drug trafficking scheme was a lucrative cash business.  It remains unclear as to how much money his business generated and what available cash Gambino may have still available.

In the event that this Court allows Gambino's release on a high cash bail and he ultimately flees, there would be no reparation for Italy.  While forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in an international extradition case caused by

14

the failure of an extraditee to appear for a hearing would leave the demanding country, Italy, with neither remedy nor compensation.

In addition to presenting a substantial risk of flight, Gambino presents a danger to the community.  In the most telling demonstration of dangerousness, the defendant admitted his participation in the murder of Francesco Oliveri as part of his 1994 plea.  Putting aside the drug trafficking scheme and loansharking and gambling operations, all in and of themselves crimes that carry with them the potential for violence, Gambino has been convicted of the most serious of violent crimes.

The Defendant has not demonstrated that "special circumstances" exist which would justify bond in his case. Further, allowance of a bond in any amount would not guarantee his presence in court.  Finally, The Defendant's release would have negative implications for American foreign policy in cases where the United States seeks extradition of fugitives from Italy.  Thus, the instant motion should be denied.

**V.   CONCLUSION**

WHEREFORE, the Government respectfully requests that the defendant be held pending the extradition hearing in this matter.

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                           By:  /s/ Kimberly P. West
                                        KIMBERLY P. WEST
                                        Assistant U.S. Attorneys

Dated: October 18, 2005

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorneys for Defendant Giovanni Gambino, George Santangelo, 111 Broadway, Suite 1706, New York, New York on October 18, 2005, in hand.

<u>/s/ Kimberly P. West</u>
Kimberly P. West
Assistant U.S. Attorney