**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF THE EXTRADITION   )
                                    )
                    OF              )      **M.J. No. 05-MJ-00876**
                                    )
          GIOVANNI GAMBINO          )
_____ )

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF EXTRADITION**

**I.    INTRODUCTION**

The relator, GIOVANNI GAMBINO, was arrested on October 14, 2005, pursuant to a provisional arrest warrant issued by this court, as requested by the Republic of Italy.  A warrant for his arrest was issued on August 29, 1990, by the Court of Palermo charging relator with crimes related to the trafficking of a high quantity of drugs and promoting, arranging and organizing a criminal association.

The relator's extradition is sought by the Republic of Italy pursuant to its extradition treaty with the United States, Treaty on Extradition, U.S. - Italy, October 13, 1983, 35 U.S.T. 3023 ("the Treaty").  See Attachment A.

The relator was held without bail by this Court in anticipation of Italy's formal request for extradition within 45 days of the Defendant's arrest.  That request arrived within 45 days at the United States Embassy in Rome, was forwarded to the Department of State in Washington D.C. and was filed with this

Court on November 30, 2005.

As Italy's request for extradition regards a prosecution different than the one relator was convicted of in the United States, the *non bis in idem* clause of Article VI of the Treaty is not violated.  In addition, this court must hold a hearing to consider the evidence of criminality presented by Italy and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  If the court finds relator extraditable, it certifies that conclusion to the Secretary of State, who decides whether to surrender him.

Because the law regarding extradition is <u>sui</u> <u>generis</u>, differing substantially from ordinary criminal or civil proceedings, the United States offers the following section of general law as a guide to the nature of the extradition hearing and the application of its distinctive features to the facts of this case.

**II.  LAW OF EXTRADITION**

At a hearing pursuant to 18 U.S.C. § 3184, the court must establish that the person arrested is subject to surrender to the foreign country under the terms of the applicable treaty, as well as under the relevant statutes and case law.  In essence, the court must determine that the following conditions are present:

(1) the hearing court has jurisdiction to conduct the extradition hearing, and proper jurisdiction over the fugitive; (2) the relator is being sought for offenses for which the applicable treaty permits extradition; and (3) there is sufficient evidence to establish that the individual appearing in court is the relator sought, and committed the offense charged.  See, Bingham v. Bradley, 241 U.S. 511, 516-517 (1916); McNamara v. Henkel, 226 U.S. 520, 523 (1913).

**A.   Jurisdiction**

A magistrate or judge may certify an extradition only after having received a "complaint made under oath, charging any person found within his jurisdiction" with having committed any of the crimes provided for by the governing treaty in the country requesting extradition.  18 U.S.C. § 3184.  In ruling on the extradition request, the court must first determine whether the person named in the complaint is the individual brought before the court.  See, Quinn v. Robinson. 783 F.2d 776, 790 (9th Cir.), cert. denied, 479 U.S. 882 (1986).

**B.   Applicability of the Extradition Treaty**

The court must next establish that the offense alleged in the complaint is extraditable by examining the relevant treaty's list of extraditable crimes.  Quinn 783 F.2d at 782-783.  The Treaty states that "[a]n offense, however denominated, shall be

an extraditable offense only if it is punishable under the laws
in both Contracting Parties by deprivation of liberty for a
period of more than one year, or by a more severe penalty."
Article II(1).  This "dual criminality" requirement does not mean
that the Italian crime must be identical to the United States
offense; all that is required under extradition law is that the
underlying acts be punishable under both legal systems by
deprivation of liberty for more than one year.  See Collins v.
Loisel, 259 U.S. 309, 312 ("The law does not require that the
name by which the crime is described in the two countries shall
be the same; nor that the scope of liability shall be
coextensive, or, in other respects, the same in the two
countries.  It is enough if the particular act charged is
criminal in both jurisdictions."); Brauch v. Raiche, 618 F.2d
843, 851 (1st Cir. 1980) (either a violation of federal or state
law suffices.)

     The government filed the extradition package from Italy on
November 30, 2005.  Part of the package included the declaration
by Kenneth R. Propp ("Propp"), an Attorney Adviser in the Office
of the Legal Adviser of the United States Department of State.
In that declaration Propp authenticated a copy of the diplomatic
note by which the request for extradition was made and a copy of
the extradition treaty between the United States and Italy.
Further, he stated that the offenses for which extradition was

4

demanded were covered by the Treaty and confirmed that the documents supporting the request for extradition were properly certified by the principal American diplomatic or consular officer in Italy, in accordance with Title 18, United States Code, Section 3190, so as to enable them to be received in evidence.

### C. __Standard of Proof__

The extradition hearing is not intended to determine whether the evidence is sufficient to justify conviction.  Collins v. Loisel, 259 U.S. at 316.  That determination is made by the foreign court which ultimately tries the defendant.  Jhirad v. Ferrandina, 536 F.2d 478, 484-485 (2d Cir.), cert. denied 429 U.S. 833 (1976). Rather, the probable cause standard is utilized.  Fernandez v. Phillips, 268 U.S. 311, 312 (1925); Glucksman v. Henkel, 221 U.S. 508, 511 (1910); Marchandi v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988); Sindona v. Grant, 619 F.2d 167, 175 (2d. Cir. 1980).

In determining whether sufficient factual allegations have been made to justify extradition, the court must engage in a liberal reading of the supporting documents, in a manner favoring extradition.  United States v. Manzi, 888 F.2d 204, 205 (1st Cir. 1989).  This liberal construction is based in part upon the recognition that foreign governments should not be expected to be

5

versed in our criminal laws and procedures.  Grin v. Shine, 187 U.S. 181, 184-185 (1902).

**D.    Inapplicability of Federal Rules of Criminal Procedure and Evidence**

The Federal Rules of Criminal Procedure do not apply to extradition proceedings.  Fed. R. Crim. P. 54(b)(5) ("[t]hese rules are not applicable to extradition and rendition of fugitives.")  The Federal Rules of Evidence are also inapplicable.  Fed. R. Evid. 1101(d)(3) (rules of evidence inapplicable to "[p]roceedings for extradition or rendition.")  Rather, "[u]nique rules of wide latitude govern reception of evidence in section 3184 hearings." Sayne v. Shipley, 418 F.2d 679, 685 (5th Cir. 1969), cert. denied, 398 U.S. 903 (1970).

For example, the introduction of testimony of live witnesses is not required at extradition proceedings.  Rather, documents containing such testimony or court findings are sufficient. Documents offered in evidence at an extradition hearing are admissible if they are certified by the principal diplomatic or consular officer of the United States resident in the country requesting extradition.  18 U.S.C. § 3190. "[A]n extradition proceeding is not a trial.  The very purpose of extradition treaties is to obviate the necessity of confronting the accused with the witnesses against him."  Mainero v. Gregg, 164 F.3d 1199, 1207 (9th Cir. 1999); see also Bingham v. Bradley, 241 U.S. 511, 517

6

(requiring "the demanding government to send its citizens to another country to institute legal proceedings would defeat the whole object of the treaty"); Quinn v. Robinson, 783 F.2d 776, 815-16 ("[b]arring hearsay from extradition proceedings would thwart one of the objectives of bilateral extradition treaties.")

Moreover, hearsay is permitted.  Id.; Collins v. Loisel, 259 U.S. at 317; Mainero v. Gregg, 164 F.3d at 1206 ("it is well settled in this circuit that evidence is not incompetent simply because it is hearsay").  Indeed, "[a] determination of probable cause in an extradition proceeding may rest entirely upon hearsay."  In re Ryan, 360 F. Supp. 270, 273 (E.D.N.Y.), aff'd, 478 F.2d 1397 (2d Cir. 1973).

**E.      Defense Evidence**

The relator's grounds for opposing an extradition request are severely limited.  He is not entitled to introduce evidence which conflicts with the evidence submitted by the requesting state, establishes an alibi or presents a defense such as insanity.  Hooker v. Klein, 573 F.2d 1360, 1368-1369 (9th Cir. 1978).  Moreover, procedural defenses are not permitted.  Bingham v. Bradley, 241 U.S. at 517.  Instead, a fugitive's right to controvert the evidence introduced against him is "limited to testimony which explains rather than contradicts the demanding country's proof . ."  Collins v. Loisel, 259 U.S. at 315-317; United States ex rel. Petrushansky

7

v. Marasco 325 F.2d 562, 567 (2d Cir.), cert. denied, 376 U.S. 952
(1963).  In addition, testimony of defense witnesses, called
pursuant to 18 U.S.C. 3191, will be permitted only if the subject
matter of that testimony conforms to this standard.  Matter of
Demjanjuk, 603 F.Supp. 1463, 1465 (E.D. Ohio 1984), appeal
dismissed, 762 F.2d 1012 (6th Cir. 1985).

In a similar manner, the defendant may not challenge the motives
of the requesting government for bringing charges against him, nor
may he assert that the procedures to be utilized in the requesting
state's trial in chief will not comport with due process, nor that he
will not receive the protections in the foreign country which he
would have in the United States.  Where such issues are raised, the
extradition court must reject them, based upon the well settled "rule
of non-inquiry." See, In re Lincoln, 288 Fed. 70, 74 (E.D.N.Y. 1915),
aff'd 242 U.S. 651 (1916).

Instead, the resolution of these issues is for the consideration
of the Secretary of State, who has the power to refuse to extradite a
prisoner, despite the fact that he is properly extraditable under
Title 18 of the United States Code.  Quinn v. Robinson, 783 F.2d at
789.

III.     STATEMENT OF FACTS

   A.  **Offense Conduct in the United States**

Relator was arrested while serving a fifteen year sentence at

8

Fort Devens, Massachusetts imposed by a federal district court in the Southern District of New York for relator's conviction there of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). Although the conviction came as a result of a plea, there had been a lengthy trial the year before resulting in a hung jury on all but one count. See Attachment B, plea agreement. At the plea hearing on January 5, 1994, relator allocuted to his participation in: (1) the murder of Francisco Oliveri; (2) a conspiracy to distribute narcotics; (3) a loansharking operation; and (4) a gambling operation. See Attachment C, transcript of plea hearing and Attachment D, Ninth Superseding Indictment, 88 Cr. 919 (PKL).[1] In exchange for his plea, the government agreed to dismiss several charges and file a nolle prosequendum in the only count to which relator had been convicted in the previous year's trial, bail jumping.

The facts that are relevant to relator's extradition are those involving the conspiracy to distribute narcotics. Specifically, relator admitted to participating "in a plan to arrange the

---

[1]  At the plea hearing, the prosecutor specified the acts to which relator pled as "1, 24, 27 and 28." Plea hearing transcript, p. 24. The prosecutor then summarizes the acts as "heroin trafficking, loansharking, gambling and murder." Id. A review of the indictment reveals that paragraphs 24, 27 and 28 correspond to loansharking, gambling and murder, but paragraph 1 outlines the hierarchy in the American mafia, "La Cosa Nostra" and does not correspond to heroin trafficking. However, racketeering act one (paragraph 15) in the indictment corresponds to heroin trafficking.

9

importation of 40 kilograms of heroin to the United States which resulted in a seizure in Milan in March of 1980." See transcript of plea hearing, p. 35. Relator testified that he "agreed with other people to import a quantity of heroin into the United States. In 1979." See transcript of plea hearing, p. 36.

**B.    Offense Conduct in Italy**

Relator was charged in Italy with conspiracy to commit crimes related to the traffic of high quantity of drug, in violation of Article 75[2] and Law no. 685 of 22.12.75.[3] See Attachment E, Warrant of Arrest, count 2. Relator was charged with 19 other people in this count. Relator was additionally charged with promoting, arranging and organizing the criminal association described in the

---

[2] Article 75, criminal conspiracy, provides: "[w]hen three or more people associate themselves together for the purpose of committing more than one offence among those provided for in article 71, 72 and 73, whoever promotes, establishes, organises or finances the criminal association will be punished, just for this offence, by a term of not less than fifteen years' imprisonment and a fine of between Lire 100,000,000 and Lire 400,000,000."

[3] This law appears to refer to Article 71 of the Italian Criminal Code which provides: "[w]homsover, without the authorisation provided by article 15, cultivates, produces, manufactures, extracts, refines, sells, offers or puts up for sale, grants or receives by any means, distributes, commercialises, acquires, transports, exports, imports, procures from others, sends, passes on or sends in transit, delivers for any purpose or otherwise illegally detains, outside of the instances provided in article  72 and 72- bis, any narocotic or psychotropic substances listed in tables I and III of  article 12, will be subject to a term of imprisonment from eight to twenty years and fined between Lire 50,000,000 and Lire 500,000,000.

previous count, in violation of Article 75 and Law no. 685 of 22.12.75.  <u>See</u> Attachment E, Warrant of Arrest, count 3.  Relator was charged with three other people in this count.

The <u>Report on the Facts Ascribed to Giovanni Gambino</u> further delineates the facts that support the criminal allegations.  <u>See</u> Attachment F.  The report indicates that relator was charged with purchasing, keeping, transporting, refining, and exporting of narcotic drugs (heroin) committed in complicity with other persons, in violation of Articles 81 and 110 of the Italian Criminal Code, and Article 71 of Law No. 685 of December 22, 1975; aggravated by the fact that Gambino belonged to a criminal association and that a large amount of narcotic drugs was involved, in violation of Article 74, paragraphs 1 and 2 of Law No. 685 of December 22, 1975. The report further indicates that the offenses were committed in Trapani, Palermo and other places in Italy and abroad in the period of 1979 to 1980.

In the report, Francesco Marino Mannoia "Mannoia," a witness in relator's American trial and in other related Italian trials, provides information relative to the counts charged.  Mannoia testified that 100 kilograms of heroin were manufactured in a group of buildings located in Baida.  The refined heroin was to be sent to relator in the United States.  Mannoia indicated that he himself manufactured the heroin and that relator came three times to Italy in relationship to the manufacturing.  Mannoia testified that he

11

last saw relator at the laboratory in Baida.  Relator came to see how the heroin was manufactured.

The <u>Preventive Custody Order in Prison</u> ("Order"), Court of Palermo, Office of the Judge on Preliminary Investigation, further delineates the facts upon which the Italians rely in support of their request for relator's extradition.  <u>See</u> Attachment G, Preventive Custody Order in Prison, p. 6.  The Order charges relator and four other identified individuals and other unidentified people, with purchasing, detaining, transporting and transforming 100 kg of morphine in heroin, in violation of section 81, 100 of the Criminal Code, 71, 74 subsection 1 n. 2 and subsection 2 of the Law n. 685/75.[4]

The Order further describes the manufacturing of 100 kg of heroin at the laboratory in Baida.  <u>See</u> Attachment G, p. 28.  It reiterates Mannoia's testimony that he refined the morphine into

---

[4]  Article 110 provides: "[w]hen more people participate in the same offence, each of them is convicted to the penalty ad hoc provided, except for the provisions of the following articles."
    Article 81 provides: "[w]ho commits one act or forbearance infringing lots of provisions or commits more infringements of the same provision shall be punished with the penalty that should be applied for the most serious infringements that is increased till three times more.  Who Commits more acts or forbearance of the same criminal plan infringing even in different times more than one or more provisions shall be punished with the same penalty.  In the case provided by his article the penalty cannot be superior to that enforceable as to the previous articles."
    These articles appear to be penalty statutes and enhancements.

heroin and that it was destined to relator in the United States. Again, Mannoia saw relator three times.  The last of which was when relator came to the lab to verify the drug processing.

**IV.   ARGUMENT**

> **A.   <u>The Italian Prosecution is Different than the American Prosecution</u>**

In the American case, relator pled to the importation of 40 kilograms of heroin to the United States which resulted in a seizure in Milan in March of 1980.  In the Italian case, relator is wanted in relationship to the manufacture of 100 kilograms of heroin in Baida.  In addition, in a separate count, relator is accused of promoting, arranging and organizing a criminal association.   The American case and the Italian case are clearly quite different.

Article VI of the Treaty provides that:

> Extradition shall not be granted when the person sought
> has been convicted, acquitted or pardoned, or has served
> the sentence imposed, by the Requested Party for the same
> acts for which extradition is requested.

The expanse of Article VI, the *non bis in idem* clause, is yet to be clarified by United States courts.  Most extradition treaties employ the term "offense" in similar clauses.  The Italian Treaty is the only treaty to use the term "acts."  However, where the prosecution in the Italian case is so different than the American case, this court should not have to parse this fine distinction.

Although there had been a six month trial in the Southern District of New York which was based on six count indictment alleging conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); racketeering, in violation of 18 U.S.C. § 1962© and 2 (Count Two); conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846 (Count Three); conspiracy to murder in aid of racketeering, in violation of 18 U.S.C. § 1959 (Count Four); murder in aid of racketeering, in violation of 18 U.S.C. § 1959 (Count Five); and bail jumping, in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(I) (Count Six), relator was found guilty of Count Six only.

Significantly, the 100 kilograms manufactured in Baida, that is partly the subject of the Italian prosecution, is also referred to in the American indictment:

> Count One, paragraph 16: " JOHN GAMBINO . . .did import and attempt to import into the United States . . . heroin . . . which had been refined by Francesco Marino Mannoia . . . early 1979–approximately one hundred (100) kilograms."

> Count Three, paragraph 37: "JOHN GAMBINO . . . functioned in the United States as receivers of the narcotics smuggled and imported into the United States and as primary wholesale distributors and sales brokers of multiple kilogram quantities of heroin and cocaine."

> Count Three, paragraph 40, overt act 2: "[i]n or about the spring of 1979, JOHN GAMBINO visited a heroin refining facility outside of Palermo, Sicily."

> Count Three, paragraph 40, overt act 5: "[i]n or about early 1979, iun Sicily, Francesco Marino Mannoia and others refined approximately one hundred (100) kilograms of heroin for shipment of JOHN GAMBINO."

However, relator only pled to Count One in the indictment, and only to acts 1, 24, 27 and 28.  Indeed, relator is careful to allocute his participation to only Count One:

> Mr. Santangelo: Your Honor, just so it is clear, the defendant understand that he's pleading guilty to Count One, and he will allocute to his participation as outlined in the letter.
> However, he wants to make clear on the record that all of the allegations in Count One, in toto, are not what he is pleading guilty to, there are many, many allegations in that count.
> We will allocute sufficiently to satisfy the Court and the government pursuant to the letter that we are guilty of a crime.  However, we do not want to mislead the Court or anyone who reads these proceedings that everything that is said in Count One is being pleaded guilty to by Mr. John Gambino.

Transcript of plea hearing, p. 27-28.

Relator only pled to limited acts in Count One.  His plea did not include paragraph 16 outlining the importation of the 100 kilograms refined by Mannoia.  Even if relator had confessed to his participation in that part of the crime, it is the government's position that such conduct is a different act for purposes of Article VI of the Treaty.  (See infra, Double Jeopardy Analysis.) Consequently, the Republic of Italy is requesting relator's extradition on different matters than those he has been convicted of in the United States.

B.    **Double Jeopardy Analysis**

Article VI of the extradition treaty between Italy and the

United States provides:

> Extradition shall not be granted when the person sought
> has been convicted, acquitted or pardoned, or has
> served the sentence imposed by the Requested Part for
> the same acts for which extradition is requested.

As the language in the above clause indicates, the *non bis in idem*
clause functions much like the Double Jeopardy Clause in the
Constitution.

The prior treaty with Italy used the term "offense" rather
than "acts."  In <u>Sindona v. Grant</u>, 619 F.2d 167 (2d Cir. 1980), the
Second Circuit examined the double jeopardy clause in the Italy-
United States treaty at that time.  The relator challenged
extradition from the United States to Italy claiming that the double
jeopardy clause as it existed then in the treaty barred his
extradition.  The court quoted the relevant treaty provision,
Article VI(1), which provided that extradition shall not be granted:
"(w)hen the person whose surrender is sought is being proceeded
against or has been tried and discharged or punished in the
territory of the requested Party for the <u>offense</u> for which his
extradition is requested."  <u>Sindona</u>, 619 F.2d at 176 (emphasis
added).

The Second Circuit noted that such "double jeopardy" provisions
had become common to many extradition treaties.  <u>Sindona</u>, 619 F.2d
at 177.  The court observed, though, that the treaty with France
provided "a notable exception by substituting 'acts' for 'offenses'

in the critical phrase." <u>Id.</u>  The court discussed at length the difficulties in defining "offense" and the difference between "acts" and "offense," observing that the term "same acts" may provide greater protection against extradition than the term "same offense." <u>Id.</u> at 177-78.  The court declined to apply, as urged by the government, the classic <u>Blockburger</u> test which compares the elements of the charge at issue.  Rather, the court appeared to reject the relator's claim on the grounds that the "conduct" at issue in the United States case was different from the "conduct" charged in the Italy case.

A district court in Eastern District of New York later interpreted <u>Sindona</u> in light of subsequent Supreme Court decisions on domestic double jeopardy.  <u>United States v. Monteil-Garcia</u>, 802 F. Supp. 773, 778-79 (E.D.N.Y. 1992).  The district court in <u>Monteil-Garcia</u> harmonized <u>Sindona</u> with those subsequent decisions and concluded that "the key double jeopardy inquiry, whether for purposes of a treaty or the Constitution, is whether the conduct for which a defendant has already been prosecuted establishes an essential element of an offense for which prosecution is now contemplated." <u>Monteil-Garcia</u>, 802 F. Supp. at 779.

In <u>United States v. Elcock</u>, an Eastern District of New York district court revisited <u>Sindona</u>.  The <u>Elcock</u> court was examining the treaty between the United States and Germany which employed the term "same offense."  It noted that <u>Sindona</u> recognized that "use of

17

the term 'same acts' in a *non bis in idem* clause confers a broader protection against extradition than a clause that uses the term 'same offense.'"  Elcock, 80 F. Supp. 2d 70, 79 (E.D.N.Y. 2000). The Elcock court observed that case law interpreting these treaty double jeopardy clauses provided no clear guidance, with limited exception.  "[L]ittle more can be said with certainty other than that a *non bis in idem* clause is more likely to be applied 'when the requested state has already commenced prosecution for the 'same, meaning identical, conduct.'"  Id. (quoting Sindona).

In Elcock, the court noted the absence of any generally recognized meaning for the term "offense" in international law, and instead looked to the legislative history of the treaty in order to determine the subjective intents of the contracting parties. Elcock, 80 F.Supp.2d at 79.  The court found that the Senate executive report accompanying the Treaty did not refer to the subject.  It also found that any meaning that German law would give to the term might be different than the American interpretation.

Instead, the Elcock Court relied on the Department of State's position that term "offense" "encompasses only crimes whose elements are identical."  As an example of what was not considered to be in violation of an "offense" based double jeopardy clause, the court cited the Department of State technical analysis submitted to the Senate in connection with the 1994 treaty with the Philippines:

18

An "offense"-based double jeopardy clause

applies only when the person sought has been
convicted or acquitted in the Requested State of
exactly the same crimes that is charged in the
requesting State.  It is not enough that the same
facts were involved.  Thus, if the person sought is
accused by one Contracting Party of illegally
smuggling narcotics into that country, and is charged
by the other Contracting party with unlawfully
exporting the same shipment of drugs, an acquittal or
conviction in one Contracting party does not insulate
that person from extradition because different crimes
are involved.

Finally, the court noted that "the principles of treaty

construction applicable in the extradition context--deference to

executive branch interpretations and the preference for

constructions that promote extradition--both support adoption of the

Blockburger test." Elcock, 80 F.Supp.2d at 83.

It is the government's position that this Court should follow

the same analysis in Elcock in regard to its interpretation of

"acts."  As there are no published cases directly on point, the

Court should defer to the legislative history and in its absence,

defer to the Executive Branch's interpretation and the preference

for constructions that promote extradition.[5]

_____

[5]  The only other case involving the current United States -
Italian Treaty is an unpublished decision out of the Central
District of California.  In the Matter of the Extradition of
Rosario Gambino, Case No. CV 01-02958 DT (RZ).  There, the
Magistrate Judge ultimately found that the relator was not
extraditable because the prosecutions in both Italy and the
United States were the same.  The opinion is hereto attached for
the court's convenience.  See Attachment H.

1.      **<u>Legislative History</u>**[6]

In 1983 the United States and the Republic of Italy renegotiated their extradition treaty.  The *non bis in idem* clause of the preceding treaty used the term "offense," however, the new treaty changed it to "act."  The legislative history provides no clear indication as to why the term was changed, and, in fact, makes little to no comment on the clause at all.  The Foreign Relations Committee Report merely stated that Article VI "follows standard United States treaty practice."  S. Exec. Rep. No. 98-33, Extradition treaty with Italy, 98th Cong., 2d Sess. (1984).[7]  See Attachment I.  The report does not specifically comment on any new purpose evinced by the change.  <u>Id.</u>

Although the Secretary of State's letter of submission for the treaty did not clarify the changing of the term, it did summarize Article VI: "extradition shall be denied when the person sought has been in jeopardy in the requested States for the same *offense*."  <u>Letter of Submittal from Secretary of State George Schultz to President Reagan</u>, Apr. 10, 1984, s. Treaty Doc. NO. 98-20, 98th

---

[6]  The Office of International Affairs, Department of Justice, is making attempts to obtain any <u>travaux</u> <u>preparatoires</u> from the Italians in relation to the renegotiation of the treaty.  Any response will be presented at the hearing.

[7]  In fact, this seems not to be true.  A review of the four treaties signed within one year before the Italian Treaty and the seven treaties signed within five years after the treaty all use the term "offense" rather than "act."

Cong., 2nd Sess. (1984).  See Attachment A.

President Reagan, however, did specifically manifest the intent to facilitate the prosecution of narcotics smuggling and other drug crimes through the 1983 updates to the treaty which made conspiracy and attempt extraditable offenses.  Letter of Transmittal from President Reagan to U.S. Senate, Apr. 18, 1984, S. Treaty Doc. No. 92-20, 98th Cong., 2nd Sess. (1984).  See Attachment A.

**2.   Deference to the Executive Branch**

Courts should defer to the Executive Branch interpretation of treaties and the preference for constructions that promote extradition.  El Al Israel Airlines, Ltd., 525 U.S. 155, 168,; First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 765 (1972); Elcock, 80 F.Supp.2d at 83.  In the absence of interpretative guidance from legislative history, this court should apply the Blockburger test in its analysis of the term "act" in the Treaty's *non bis in idem* clause.  Id.

Although Sindona provided for a broader reading of double jeopardy treaty provisions, other contemporary cases hold that the relator's double jeopardy rights are more limited.  See United States v. Jurado-Rodriguez, 907 F.Supp. 568 (E.D.N.Y. 1995) (where *non bis in idem* clause employs the term "faits," translated into "factual elements," and *non bis in idem* relates so closely to United States double jeopardy concepts, then double jeopardy burdens of

proof applies); <u>Gusikoff v. United States</u>, 620 F.2d 459 (5th Cir.
1980) (finding that the double jeopardy clause is not activated
where petitioner was convicted for fraud committed in New York and
extradited for similar fraud committed in the United Kingdom); <u>Stowe</u>
<u>v. Devoy</u>, 588 F.2d 336, 339 (2d Cir. 1978), <u>cert. denied</u>, 442 U.S.
931 (1979) (finding that double jeopardy must cover the same acts as
those which are the subject of the extradition request but must also
have been the subject of formal charges for which the defendant was
tried).

In <u>Blockburger v. United States</u>, 284 U.S. 299 (1932), the
Supreme Court held:

> the test to be applied to determine whether
> there are two offenses or only one, is whether each
> provision requires proof of an additional facts which
> the other does not.

Here, the Republic of Italy requests the extradition of relator
to try him for purchasing, keeping, transporting, refining, and
exporting of narcotic drugs (heroin) committed in complicity with
other persons and for promoting, arranging and organizing a criminal
association.  The heroin at issue in Italy involves 100 kilograms
manufactured by Mannoia in Baida in early 1979.

In contrast, relator pled to crimes in the United States that
involved the importation of 40 kilograms of heroin to the United
States which resulted in a seizure in Milan in March of 1980.  Not
only are these crimes not the same by the <u>Blockburger</u> standards, the

22

crimes involve different drugs all together.  That relator was convicted of a conspiracy in the United States that may have covered a range of time, he pled to very specific acts that are wholly unrelated to the crimes alleged in Italy.  Furthermore, relator is additionally accused in Italy of separately, organizing a criminal enterprise in Italy, a crime to which he was not charged in the United States.

V.   **CONCLUSION**

For the foregoing reasons, the United States requests the certification of the relator, GIOVANNI GAMBINO, for extradition to the Republic of Italy.  The Republic of Italy requests his extradition for wholly different crimes than those he was convicted of in the United States.  Further, if this court were to find that the crimes are based on the same facts, then the court should apply the Blockburger test and certify his extradition because the Italian crimes require proof of elements that the American crimes did not.

<div style="margin-left:50%">

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:      /s/ Kimberly P. West
         KIMBERLY P. WEST
         Assistant U.S. Attorney

</div>

DATED: December 16, 2005

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney for defendant Giovanni Gambino, Paul Kelly, Kelly, Libby & Hoopes, 175 Federal Street, Boston, MA 02110 on December 16, 2005, by electronic mail.


<u>/s/ Kimberly P. West</u>

Kimberly P. West

Assistant U.S. Attorney